Thank you, Brian. The State of Illinois Industrial Permission Division of the Federal Courts is back in session. The Honorable Justice, will you yield the floor, Richard, for the silence? Please be seated. Thank you. Before we begin our afternoon session, you'll notice that there are four of us here and the Court has five Justices. The Justice from the Fifth District is unable to be in attendance today, but will be participating wholly in each one of your cases. He has the benefit of your written briefs, has the benefit of the entire record, and, importantly, has the benefit of your oral arguments today. So, unfortunately, due to other business, judicial business, he cannot be here. But, again, he is here and will be participating in your case. With that being said, will the Clerk please call the first case of the afternoon? 117-0395, Flynn McGrave v. Bank of America. Justices, good afternoon. It's my pleasure to be here in front of you today to talk about this case. Unfortunately, you already know what the results were coming in here, so I am not going to rehash any of the facts. I know that you're all wise and intelligent and have had an opportunity to discern what the major facts are, but I think what I'd like to focus in on is what's the central issue in this case here? Can I ask two things before you get into that? Number one, what's your name? I'm sorry. I thought I said my name is Anthony Kudo, C-U-D-A. We know who you are, but this is for the record. I'm sorry. Second of all, am I correct in suggesting that you never contested whether the event with the Girl Scouts was, in fact, recreational activity? That is not part of your appeal. That's correct. Okay. Yes. All right. $44,000 for State of Illinois Bank of America employees. $44,000. There is some information in the exhibits that we presented, specifically, I believe it was exhibit number 11, where the bank had a goal of 1.5 million hours of volunteerism. If you just take a look at what the greatest hourly wage was at the time, right around $50 an hour, that translates to be about $75 million on an annual basis in volunteerism. Over about a 10-year period, that's almost $750 million. And again, it's on the record. Why do I bring that up in this situation? To bring up the fact that volunteerism is just such a huge big deal for Bank of America that they had quotas, actual quotas, for their employees to meet and target. It wasn't just, hey, go to the corner store and sell some cookies like the Girl Scouts are doing. It wasn't, let's just go volunteer one time at a church. This was an orchestrated event to participate in a number of others. I think so far you've given an accurate assessment of the evidence in the background of the case, but I'm a little bit intrigued. Why doesn't Section 11 of the Act control this case? Section 11? Accidental injuries occurring while participating in voluntary recreational programs, including but not limited to athletic events, parties, picnics, do not arise out of in the course of the employment, even though the employer pays some or all of the cost thereof, unless the injured employee was ordered or assigned by the employee to participate in the program. So why does that not control in this case? Well, the second part of that, of what you just read, is the employees are assigned, directed, and controlled to participate. And this is not a recreational event, Justice. This is more of a volunteer. That's why I asked you the question at the beginning. Did you contest the recreational nature of the activities you participated in? You told me no. I read your brief. You never raised the issue. So, for all intents and purposes, it is a recreational activity, and the arbitrator found, specifically, she was not ordered or assigned to attend the gross out of that, but instead participated under her own volition. The bank merely encouraged the employees to volunteer. They were not paid for volunteering. Performance reviews were not contingent upon volunteering. And her duties as a project manager were unrelated to her role as co-chairperson of community volunteers. Also, through it, that any benefit to the bank accruing from the claim's participation was tenuous and intangible. The commission affirmed and adopted it. So why is the arbitrator wrong? The arbitrator is wrong because she's asking to measure what I started talking about is goodwill. How do you measure goodwill? How do you derive a benefit from a TV commercial if you're a bank or insurance company? You don't know because they can't actually measure or translate that. Well, what Bank of America was doing in this particular situation was they had a scheme in place to develop community, to develop good relationships with the community. If you look at page five of the brief that we cited, there's a direct quote from the CEO of the company, that says, And he goes on to say, What do they do this for? Are they just being nice guys? I think they're doing it because they're deriving a direct benefit from this. This lady had to meet quotas. So that's why it looks like, in my view... When you say she had to meet quotas... Yes. ...the evidence of the record suggests that if she didn't participate, nothing was going to happen to her. She's a state chair. Where is the evidence in this record that anything adverse would happen to her if she did not participate? In fact, the evidence is exactly the contrary. Well, the evidence is nothing adverse would happen to her, but it was reflected upon her. There was consideration. She was paid in terms of gifts, awards, and that was reflected in her overall company review. And when a company from New York says what the... testified specifically that she was not compensated or reimbursed for her activities on the day in question. He acknowledged that she was never reprimanded for failing to appear at an event, and her salary was unaffected by whether she volunteered. I agree with you, Justice. She's a salaried employee. There is documentation in the company handbook, which was provided, that employees are compensated two hours a week. So she could take those hours anytime she wanted. There was... she submitted expense logs. Now, later on, Mr. Schwartz shakes his head and says, oh, that was a mistake, and that comes up a year and a half later. Well, that's just... I mean, that's just nonsense. Well, whether he was telling the truth or not was a matter for the commission to say. Was there any evidence, any evidence in this record, that any employee of the Bank of America was ever punished or had adverse employment consequences because of not participating in volunteer activities? No, there's no record of that. Okay. But I think the better point that I'd like to raise is, did this bank derive a direct benefit from the services and actions of this person? You know what? I think you can make a strong argument that the bank did benefit from the activities of Ms. Gray. But I'm asking myself, what is the rule of law that you believe applies here? Is the test, is the injury compensable because the general rule is that the bank benefits in some level? It's compensable? Or what is the rule of law that applies here? I'd like to answer that, Justice. And the rule of law is, did she commit an act in furtherance of her company's business? And when we all go to work every day, if we're doing something that enhances or makes your company or your office better and the company derives a benefit from it, that's an incidental act of employment. So you're saying that by implication, especially now it's not raising Section 11 of the Act, you're saying Section 11 doesn't control here is whether the company benefits? The second part of the Act. She's assigned to do this kind of work. Why would they set up such a national scheme in 50 states to develop a network of tentacles that reach out into the community? This is grassroots community volunteering just like it would be for a political campaign. And they're trying to get their message out. Whatever their message was, they used people like Linda to raise money. Can I ask you a question? If that theory that you're making is correct, then any time that an employer sponsors a baseball team and they put the name on the back of the baseball jersey, even though the employees are not required to participate in that activity, they're not paid to participate in that activity, because the advertisements on the back of the shirt, you say it's compensable if they're going from second to third. I think, Your Honor, when you look at the totality of what Linda did, I'm not talking about baseball. I'm talking about what did she do to develop and enhance the company's business. There was some testing. Let's get back to the statute. Was she ever ordered to participate in this Girl Scout activity? No. Ordered? Ordered. You mean if you don't show up... Was she ordered and told she had to go? I... The answer is no. We both know the answer is no. Okay. Was she assigned by her employer to go there? I would say yes. No. She got a call from a woman who participated in a different volunteer activity asking her if she'd participate, and she said yes. But she was not assigned to go there by her employer. And Section 11 is very, very clear. It's not out of and in the course of the employment unless, quote, the injured employee was ordered or assigned by his employer to participate in the program. Justice Hartman, how did this woman come to know there was an event at this Girl Scout? She got a call from another woman. You want me to find the name for you? I don't know who it was. It was Sandy Zarkos, and it wasn't the call. It was an e-mail on company computer to company employees. So what? That's an assignment. Wait a minute. Was the lady that sent the e-mail her boss? She was another co-chair with her for the Santa Rosa. She didn't tell her she had to go. What did she say in the e-mail? Requested that she attend the Girl Scouts event. That was it. Okay. Well, you're stuck with the statute. Your better argument is going to be assigned. On behalf of LEADS for volunteering to help clean a Girl Scouts campground in Woodridge, Illinois, thank you, thank you, on behalf of LEADS for volunteering. I have difficulty with this because if your argument on there was some benefit to the employer holds true, then every injury in every baseball game, every bowling event, where somebody wears a jersey or a bowling shirt with the name of an employer on the back of it is compensable. No, Judge. There's benefit. No. Well, that's advertising. That's strictly advertising by putting someone's name on a company shirt. I mean, these race car drivers, they have a hundred names on there. I'm not for once suggesting they're at the same status as a Melinda Gray. Melinda Gray is an employee of the company, and she's not only an employee of the company, she's co-chair of volunteerism for Bank of America. And she's assigned. She's assigned to get $44,000 a month. That's going to be your better argument, as I was trying to give you the hint. Forget about Orville. You're going to be hanging in there on a slender reed, so to speak, and that is how she falls within the assigned part of the statute. So that's going to be where you're going to have to make your case. How is she assigned to do this? Okay. It's a company network. It's a company computer. It's a company direction. Now, there is no threat or compulsion to do some of these things, but she does get benefits for participating in them. She gets awards. She gets a certificate. She gets points. So there is a quid pro quo for this. The more you do, the more you'll do. And one thing I hope that you saw was when she did get an employment review, there was an actual notation on there that she's part of this Bank of America community-sponsored volunteer program. So that was part of what she was actually put up for review. And what she did say is that that was one of the factors that was looked at in terms of whether or not she gets a promotion. So when a company is looking at people in terms of promotion, they're looking at the overall total package. Why would they do something like this? I mean, why would Bank of America insist that there's a million and a half hours for volunteerism for their employees? Why would they insist upon this? There's only one reason why. They're attempting to enhance their face in the community. When you hand out T-shirts... We're dealing, one, with the... Okay, I think maybe you misunderstood the hypothetical. It's actually, in our cases, where an employee shows up on the quote company team, plays baseball, gets injured. Now, we're not talking about the Little League sponsorship where there's no connection with the employer. So let's not go there. But what is the purpose of that, of a company team? Well... Of employees. At one time, that was the law of the land. The JOT case was if there was a company completely sponsored event, there was compensation if an employee was injured. And the statute came into effect. Right. And the statute said there was no longer recreational. This is slightly different. In the facts, as Ms. Gray presented, as she testified to one of her own, she was not just a casual participant. She was the state director, responsible for office. They have monthly meetings. They have people. She has people under her that she's accountable to. And again, it's a direct benefit. Is anyone in this program assigned or compensated to participate in these activities? The only... Yes. Our employees are paid two hours a month for every time they participate. Now, Ms. Gray is a salaried employee, so she can take compensation time if she wants to take some additional time off. She testified that she has to give her supervisor, that Schwartz, whenever she's not around, whenever she's doing something, she's taking vacation time or she's participating in volunteerism, she has to talk to him about that. So, yes, there is compensation in that sense. With two hours of... How much is the compensation? Two hours of hourly time. That's not quite how it works. The bank would pay an hourly paid employee for two hours a week of volunteering. And it came out of the... Two hours a week they can volunteer and get paid. Right. But Schwartz, or pardon me, Bentley, Archos, and Schwartz testified for the bank. They admitted that the bank encourages the volunteerism and its employee handbook permits employees to volunteer two hours a week while still receiving their salary. However, the bank does not pay employees for volunteering or grant paid time off for volunteer work performed outside of an employee's normal schedule. And that was what happened in this case. She was not on the clock when this happened. No, it was a weekend. No policy required volunteerism, imposed a minimum number of volunteer hours on each employee, or made compensation bonuses, raises, or promotions contingent on volunteering. According to them, there were no negative repercussions if an employee did not record any volunteer hours. I mean, that was their testimony. Bill Schwartz testified. Yes. Bill Schwartz testified. Right. But my client testified something different. She testified that she received compensation time so she could take time off. She also, that was factored in her promotions. That was factored in her overall view of how the company looked at her in terms of her performance and skills. If I can call out the essence of what you're saying, are you trying to say that basically the company had an ongoing, open, continuous invitation to participate and somehow that's tantamount to an assignment? That's fair stated. Okay. On that, your time is up. May I ask a question? Yes, you may. We skipped over standard of review. You suggested in your briefings to know why. Well, I think it's de novo because it's something that you can just take into consideration without staying within the confines of manifest way to evidence. And that's why I believe it's a de novo standard because the manifest way to the argument in this situation I believe is, you know, if you just look at manifest way to the argument, that's one sense. But the de novo argument gives you the ability to take everything from the beginning and from scratch and use your own common sense and wisdom applied by the law. And that's why I believe it would be a de novo standard. It also benefits you to be blunt about it because a de novo, as you well know, Mr. Puda, means that we view it in that there is no deference given to the movement below. Well. You want a de novo standard. I would like a de novo standard, Justice. Thank you. Thank you. Do you have time? You have just five minutes to reply. Okay. We'll see you again. Thank you. In response? Thank you, Your Honor. Good morning. Or good afternoon. My name is Peter Jacobson. May it please the court, counsel, I represent the bank in this matter. Mr. Puda brought up a few terms and one I found actually really appropriate. He mentioned the term casual participant. Of course, he was arguing that his client was not such a participant in this event. However, I think the facts would prove out that that is the case. And I think we really need to bear down on section 11, as the justices have suggested already. We look at three things that the commission interprets. Did the accident occur on the premises? Was the activity mandatory? Was there a substantial direct benefit to the driver and the employer beyond any intangible value? Obviously, number one is out. The accident was not on the premises. But number two we move to is this whole mandatory nature, alleged mandatory nature of what was going on here. And what I think Ms. Gray would like to do is include her co-chairmanship of this committee in Illinois, Bank of America, as part of her job. Let's just make this easy. There's contradictory evidence in the record as to whether she was or was not assigned to do it. The commission chose to believe Schwartz. End of story. That's a credibility issue. What about the third element, substantial benefit? I think the substantial benefit argument is extremely hard for the petitioner, for Ms. Gray, to uphold here. And the reason is there was absolutely no evidence introduced at time of trial whatsoever of any sort of pecuniary financial benefit to the bank. She didn't hand out any business cards. Is that what it has to be? Well, I think that's a key, Your Honor, I think that's a key factor to look at as far as a substantial direct benefit to the employer. A substantial direct benefit, it could be goodwill. Absolutely. The commission had found in favor of Mr. Schwartz's client. Do you think you would be able to say that there was zero evidence of a direct benefit to the Bank of America? I don't think I can say there was zero evidence of any benefit to the bank. And I would freely admit that the bank participating in these types of activities in the community, they do have a benefit. They are not completely selfless. It doesn't have to be a monetary or pecuniary benefit, does it? I think that would be the easiest way for the court to prove it. But it wouldn't have to be. I think you're testily conceding goodwill could be a benefit, couldn't it? No, perhaps not, Your Honor. I don't disagree that that isn't the only way to prove it. But I do think that is, that's what Ms. Gray herself focused in on at time of trial, that she is developing means and marketing at these events. So didn't she have an employee performance review that basically got into that subject? Yes. She, so the way the reviews were structured, as you probably noticed, there was part of it was written by her supervisor, and then there was a part that was written by her. And obviously the supervisor did mention, Mr. Schwartz did mention voluntary activities at the end of her review. Well, it must have been of some benefit to the company. Why would he even mention it? It is. I don't think there's an argument to make that it is zero benefit to the bank. I would not stand up with a straight face and say that to you here today. I don't think that's true. I think there is an intangible benefit to the bank, but how do you measure the benefit, which is why I started to veer towards the financial piece. Admittedly, that is not the only way, but I do think when all is said and done, that's what Ms. Gray was getting at. She used these events as marketing opportunities. This woman was very, very candid on the stand. Yes. She testified that she brought business cards to the event, and together with others, they wore T-shirts that provided Bank of America community volunteers. She said she photographed the employees wearing these T-shirts, but candidly stated she didn't recall distributing any of the cards or discussing the bank service with anyone at the event. She was very honest about it. She also acknowledged that she did not produce any evidence that the bank generated business from the Girl Scouts event. But I suppose that leaves us with the question, what were they all doing wearing Bank of America shirts? Was that the latest fashion from Versace or somebody? I don't know. Why were they wearing it? I'm impressed by your knowledge of fashion. That's pretty good, actually. Again, I do think that an argument cannot be made that there is zero benefit. Everybody will agree in this room that there is some intangible benefit to the bank and any company participating in an activity like this. However, I don't think there is, especially at events like this where the bank didn't even, they weren't the ones that organized this event. They were participants, maybe casual participants, but they were participants in this activity. And it was organized by the Girl Scouts. This was open to the public. Anybody could have volunteered at this thing. This wasn't just bank employees. You look at the case law that counsel cites in support. For all practical purposes, all of those softball team athletic type events were all restricted to company employees only. So Ms. Gray brought some family members with her. I mean, this was not something that, it was so tenuously related to anything to do with the bank was encouraging people to come, its employees to come, and give back to the community. And I'm not going to be quite as cynical as counsel may have been in his arguments about the bank. I do think there are probably some people there that believe in doing that, including the people that testify on behalf of the bank. Ms. Bentley, 29, almost a three-decade employee, has volunteered her entire time there and has never viewed her time as mandatory or that she was getting anything out of it other than just giving back. What about a case that the evidence was this? It's clear that the only way you're going to get ahead in the company is to volunteer for these things. There's sort of an ongoing continuous pressure by the employer that you need to do this. You're not assigned in writing, but there's an ongoing pressure to do this. If you want to get ahead, you want to get raises. I don't know how that exists in this case. It doesn't, but how far does it always have to be a specific written assignment to the event? I don't think it would have to be written. I mean, the case law, it's an old case law, but it's still a good case law, and it suggests that there was, in the Jooltee case, for example, that was brought up earlier, there was direct pressure from the supervisor. A guy on the phone said, hey, a guy on our team saw Paul Dean this year. The gentleman felt foolish, and so he signed up because he felt pressured by his supervisor. I mean, I think there's going to be those types of scenarios still. But you're saying it doesn't rise to the level in this case? In this case, there's absolutely zero evidence of it. There's zero evidence of pressure from the bank. And, you know, we can talk about it. I think Paul is the absolute wrong word to use. There's no requirement, mandatory requirement that an hourly goal will be met. It was a goal. It was something that the bank was striving for. There is absolutely zero evidence in the record of any sort of penalty, punishment for not meeting those goals. And the same goes for, you know, Ms. Gray, speaking to her directly or personally, her compensation was never impacted whatsoever, testified to by her supervisor. She didn't even admit it. So, you know, she was going to get paid the same regardless. And clearly she's worked her way up in the company and has done a lot for herself. As in this family, another employee who was very committed to volunteering through the bank, but never looked at it as part of her appointment. So I really think that that argument is just a very, extremely tenuous argument to make. And to be perfectly honest, it suggests a chilling effect on companies that are going to try to engage in this type of behavior. Again, admittedly, that there is a benefit to both sides, I would say, when you're encouraging this type of volunteerism amongst your employees. There's no question about that. Do you see a distinction between the cases that involve company-sponsored events as opposed to a company employee participating in a non-company-sponsored event? I do think it takes it one step further away from it being a compassionate claim, Your Honor. And in this case, I do think it is key that the bank did not organize this event. It was a participant in this event, which further goes against the argument that it was any sort of mandatory requirement that someone attend this event. So I do think there is – I think under all circumstances, I would still prevail. But I do think it makes it even easier when you remove one step away from if this was a bank-sponsored event versus a non-bank-sponsored event. If it was a bank-sponsored event, perhaps, you know, obviously these are all very fact-specific scenarios, perhaps there could be a situation, again, if there was pressure, you know, inferred, implied pressure to attend, things like that. Does that rise to the statutory exemption that says ordered or assigned? I mean, are we off on some rabbit hole here? The word is was ordered or assigned by an employee, okay? Where's pressure coming from? Well, I think that the way that the case law reads is that, you know, like in the Jewel T case, for example, I don't think they would express the order. Well, did the Jewel T case precede this section? So why are we talking about that? Well, it was – it came up on me during the counseling. Well, I understand that, but we know – is Jewel even good law now? Well, technically, it still shows it's good law, but I understand that it can be interpreted differently now with Section 11, the way it reads now. But I do think that there's a real concern here, an overarching concern, that this would be a chilling effect on companies even engaging in this type of behavior anymore. If you're going to say every time there's a T-shirt there at an event that's not even sponsored by the bank, that all of a sudden that person is not working and they're injured at that event, no, all of a sudden that's a compensable claim. I think that is a rabbit hole. I think that's dangerous. I think that's a slippery slope in very discouraging companies. So in sum, I just don't think that Ms. Gray has done what she needs to do to overcome the standard here, the manifest wage standard that exists, and the judgment of the Circuit Court and the Commission should be affirmed. I would respectfully request that from your Honors. Thank you, Counsel. Thank you. Counsel, you may reply. Yes, this is me. I'll just take the last couple of minutes and just take a look at the Illinois Bell case, where the elements to be considered determine whether the employee's injury rolls out of the course of employment. They talk about the impression of casual or referred, exerted on the employee to participate in a benefit derived by the employee from the particular recreational activity. So this is not just some small, one-time event. This is a national, of national proportions of this thing. Bank of America is trying to make themselves look good in the community for whatever the reason is, and they're using that not just because they're nice people, but because they want to put their image out there so people will buy their credit, take their credit cards, or get mortgages from them because they're nice people that do business. So that's the underlying tool of what we talked about earlier about the goodwill. Goodwill doesn't have to be an actual number that you can measure, but when you have this kind of elaborate scheme, there's a whole reason behind it. And so my client has a snapped ankle and went through a lot of pain and suffering, and I don't think, you know, what Mr. Jacobson is going to describe, it's not going to have a chilling effect because this is a case-by-case basis. If it wasn't, if she didn't have an internal connection with the bank and she wasn't a number-level manager and a number-level manager of volunteerism, I don't envy her. But because she's so intricately involved and she plays such a huge role in promoting the bank's image, I think this case must be reversed and she should be compensated. Because if she's not compensated, you've just taken a situation where the bank has derived a huge benefit from what she's done, $44,000 or $45,000 hours a year. That's a big deal. It's not just a one-time event. Well, what's her job description? Her job description is she's, her actual job description, doesn't move out, doesn't take in volunteerism. Well, why make her a co-chair? What is her job description? What does she do? She doesn't count, cancel checks. What does she do? No, she's on the securities and dealing with bank operations and managements, and she works 24-7, seven days a week, because sometimes she has to make international meetings so that she participates over the phone or over the Internet, so she's working all the time. But that's separate from what she does for the bank in terms of her volunteerism. Okay, okay. But what if we change the facts and she happens to be the person in charge of this program of volunteerism? Would you think you'd have a better case? Maybe. Maybe I would. What if she worked for American Red Cross and she goes to Miami or Puerto Rico and breaks her leg? Should she be compensated? I think she should. Because why should it make a difference if the Red Cross' business is exclusively helping and taking care of people in situations? That's what she was doing. She's helping people that are in a situation that need her help. She's, in a sense, acting like she's the Red Cross. You're not going to pay compensation to an employee of Red Cross? I think in this particular situation, this is a fact-specific case. The facts are exactly what they are. She has an injury and she participated in this event because the company, in a sense, assigned her to do that. It's the company's computers. It's the company employees. It's the company's internet system. And there's a whole scheme that was put out by the CEO of the company. This is a policy derived from the CEO of the company. So he sends the policy out to the rank-and-file employees. That's the culture of Bank of America. So, in this sense, I believe that she should be compensated and the circuit court should be reversed. And thank you for your time. This is one of the most interesting cases I've had. Unfortunately, I didn't get the kind of results I was hoping for. But I thank you for your time. Well, thank you, counsel. Thank you, Counsel Moe, for your arguments in this matter. It will be taken under advisement and written disposition.